**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO. 3:20-CV-00186-DJH-CHL**

**SHANNON C.,[1]**                                                                        **Plaintiff,**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**                                    **Defendant.**

## REPORT AND RECOMMENDATION

Before the Court is the Complaint filed by Plaintiff, Shannon C. ("Claimant").  Claimant seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner").  (DN 1.)  This case was referred to the undersigned Magistrate Judge to prepare a report and recommendation.  (DNs 7, 16.)  Claimant and the Commissioner each filed a Fact and Law Summary.  (DNs 17, 23.)  Therefore, this matter is ripe for review.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.     BACKGROUND

On or about September 22, 2016, Claimant filed an application for disability insurance benefits ("DIB") alleging disability beginning on August 25, 2015.  (R. at 16, 35, 66, 81, 83, 98, 184-92.)  On October 11, 2018, Administrative Law Judge ("ALJ") Thomas Auble ("the ALJ") conducted a hearing on Claimant's application.  (*Id.* at 33-64.)  In a decision dated December 12, 2018, the ALJ engaged in the five-step sequential evaluation process promulgated by the Commissioner to determine whether an individual is disabled.  (*Id.* at 13-32.)  In doing so, the ALJ made the following findings:

---

[1] Pursuant to General Order 22-05, the Plaintiff in this case is identified and referenced solely by first name and last initial.

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2021.  (*Id.* at 18.)

2.      The claimant has not engaged in substantial gainful activity since August 25, 2015, the alleged onset date.  (*Id.*)

3.      The claimant has the following severe impairments: degenerative changes of the lumbar spine; chondromalacia of the patellofemoral compartment of the left knee; status post total right knee replacement; tendinosis of the left shoulder; polyneuropathy; and obesity.  (*Id.* at 19.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (*Id.* at 20.)

5.      [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he can never climb ladders, ropes, or scaffolds, or crawl.  He can occasionally climb ramps or stairs, and occasionally balance, stoop, kneel, and crouch.  He can occasionally push and pull bilaterally with the lower extremities.  He can occasionally reach overhead with the left upper extremity, and frequently bilaterally reach otherwise.  He can have no exposure to excessive vibration, unprotected heights, or hazardous machinery. He is limited to simple, routine tasks due to pain and any other side effects.  (*Id.* at 21.)

6.      The claimant is unable to perform any past relevant work.  (*Id.* at 24.)

7.      The claimant . . . was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  (*Id.*)

8.      The claimant has at least a high school education and is able to communicate in English.  (*Id.*)

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  (*Id.*)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (*Id.*)

11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 25, 2015, through the date of this decision.  (*Id.* at 25.)

Claimant subsequently requested an appeal to the Appeals Council, which denied his request for review on January 27, 2020.  (*Id.* at 1-6, 180-83, 319-23.)  At that point, the ALJ's decision became the final decision of the Commissioner.  *See* 20 C.F.R. § 422.210(a) (2021); *see also* 42 U.S.C. § 405(h) (discussing finality of the Commissioner's decision).  Claimant is presumed to have received that decision five days later.  20 C.F.R. § 422.210(c).  Claimant timely filed this action on March 13, 2020.  (DN 1.)

## II.   DISCUSSION

The Social Security Act authorizes payments of DIB to persons with disabilities.  *See* 42 U.S.C. §§ 401-434.  An individual shall be considered "disabled" if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a) (2021).

### A.   Standard of Review

The Court may review the final decision of the Commissioner but that review is limited to whether the Commissioner's findings are supported by "substantial evidence" and whether the Commissioner applied the correct legal standards.  42 U.S.C. § 405(g); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  "Substantial evidence" means "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have supported the opposite conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *see Smith v. Sec'y of Health & Hum. Servs.*, 893 F.2d 106, 108 (6th Cir. 1989) (holding that

if the Court determines the ALJ's decision is supported by substantial evidence, the court "may not even inquire whether the record could support a decision the other way"). However, "failure to follow agency rules and regulations" constitutes lack of substantial evidence, even where the Commissioner's findings can otherwise be justified by evidence in the record. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

### B. Five-Step Sequential Evaluation Process

The Commissioner has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating a disability claim. 20 C.F.R. § 404.1520 (2021). In summary, the evaluation process proceeds as follows:

(1) Is the claimant involved in substantial gainful activity? If the answer is "yes," the claimant is not disabled. If the answer is "no," proceed to the next step.

(2) Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement[2] and significantly limits his or her physical or mental ability to do basic work activities? If the answer is "no," the claimant is not disabled. If the answer is "yes," proceed to the next step.

(3) Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1? If the answer is "yes," the claimant is disabled. If the answer is "no," proceed to the next step.

(4) Does the claimant have the residual functional capacity ("RFC") to return to his or her past relevant work? If the answer is "yes," then the claimant is not disabled. If the answer is "no," proceed to the next step.

(5) Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work? If the answer is "yes," the claimant is not disabled. If the answer is "no," the claimant is disabled.

20 C.F.R. § 404.1520(a)(4).

---

[2] To be considered, an impairment must be expected to result in death or have lasted/be expected to last for a continuous period of at least twelve months. 20 C.F.R. § 404.1509 (2021).

The claimant bears the burden of proof with respect to steps one through four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  However, the burden shifts to the Commissioner at step five to prove that other work is available that the claimant is capable of performing.  *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008).  The claimant always retains the burden of proving lack of RFC.  *Id.*; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999).

### C.    Claimant's Contentions

Claimant challenged the ALJ's Finding Nos. 4, 5, 9, 10, 11.  (DN 17, at PageID # 1503-12.)  Specifically, Claimant argued that the ALJ erred in finding that he did not meet the requirements of Listings 1.02 or 1.03 and in failing to specifically discuss the combined effects of his impairments in determining whether or not he met the Listings.  (*Id.* at 1504-06.)  Claimant also argued that the ALJ erred in determining that he could perform sustained sedentary work by using only selected portions of his medical records to support the RFC determination, failing to evaluate whether he was entitled to closed period of disability, failing to follow SSRs 96-8p and 96-9p, incorrectly assessing his testimony regarding pain, and in the weight attributed to the opinion of the state agency physicians.  (*Id.* at 1506-11.)  Finally, he argued that the errors in ALJ's determination of his RFC caused errors at later steps.  (*Id.* at 1512.)  The undersigned will address each of these arguments below.

### 1.    Listings 1.02 and 1.03

Claimant argued that the ALJ erred in concluding that he did not meet the requirements of either Listing 1.02 or 1.03.  (DN 17, at PageID # 1504-06.)  At step three of the five-step evaluation process, the ALJ considers whether the claimant has an impairment that satisfies the criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, which are generally referred to as the

"Listings." 20 C.F.R. § 404.1520(a)(4)(iii). "[A] claimant who meets the requirements of a listed impairment will be deemed conclusively disabled." *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 653 (6th Cir. 2009). A claimant's impairment satisfies a Listing only when the claimant manifests the specific requirements described in the Listing's medical criteria. 20 C.F.R. § 404.1525(d) (2021). To meet the requirements of a listed impairment or its equivalent, a claimant must demonstrate specific findings that duplicate the enumerated criteria of the listed impairment. *Lawson v. Comm'r of Soc. Sec.*, 192 F. App'x. 521, 529 (6th Cir. 2006); *see also Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004) ("When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."). The claimant bears the burden of proving his or her impairment satisfies all the specified criteria in a given Listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

In his opinion, the ALJ discussed whether Claimant had met the applicable requirements of Listing 1.02 related to major dysfunction of a joint due to any cause and Listing 1.03 related to reconstructive surgery or surgical arthrodesis of a major weight-bearing joint. (R. at 20.) The entirety of his analysis was as follows:

> The claimant's impairments do not meet listing 1.02, which addresses major dysfunction of a joint. The claimant has not established that he was unable to either ambulate effectively or perform fine and gross movements effectively. The record showed the claimant had a normal gait and full range of motion in the left shoulder, with strength only minimally reduced to 5/-5. (Exhibit 36F pg. 1; 24F p. 6)

> The claimant also did not meeting listing 1.03 regarding reconstructive surgery of a major weight-bearing joint. As discussed above, the record did not show an inability to function effectively. (Exhibit 36F pg. 1)

(*Id.* (citing *id.* at 904, 1290).)  Claimant argued that this analysis was insufficient because the ALJ did not consider "all the evidence on ambulation" in conjunction with his assessment and that "nothing in . . . [step three] of the decision [ ] allows a reviewer to determine what facts in the medical record the ALJ relied on for his reasoning."  (DN 17, at PageID # 1504.)

The applicable regulations provide that at step three, the Commissioner will "consider the medical severity of [a claimant's] impairment(s)."  20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant's impairment "meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment[ ]," a claimant will be found disabled.  20 C.F.R. § 404.1520(d).  In determining whether a claimant's impairment is medically equivalent to a listing, the Commissioner "will consider medical equivalence based on all evidence in [the] case record about [the claimant's] impairment(s) and its effects on" the claimant.  20 C.F.R. § 404.1529(d)(3) (2021); *see also* 20 C.F.R § 404.1526(c) (2021).  Given that there are so many potential Listings, the regulations do not require an ALJ to address every listing in his or her findings.  *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013).  If "the record 'raises a substantial question as to whether [the claimant] could qualify as disabled' under a listing, the ALJ should discuss that listing."  *Id.* (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)); *see also Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014).  A "substantial question" requires the claimant to "point to specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of the listing."  *Smith-Johnson*, 579 F. App'x at 432.  Without such evidence, the ALJ "does not commit reversible error by failing to evaluate a listing at Step Three."  *Id*. at 433.

The regulations do not specify how much discussion an ALJ must provide regarding those Listings as to which a substantial question is raised.  However, the Sixth Circuit has held that in evaluating whether a claimant has met a particular listing, an ALJ must "actually evaluate the

evidence, compare it to . . . the [relevant] Listing, and give an explained conclusion, in order to facilitate meaningful judicial review."[3] *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011).  This is not a heightened articulation standard because as the Sixth Circuit has also acknowledged the applicable regulations only require the ALJ to *consider* whether the Listings are applicable; they do not require the ALJ to provide "good reasons" as in the context of the former treating physician rule.  *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365 (6th Cir. 2014) (citing 20 C.F.R. § 404.1520(a)(3), (a)(4)(iii) and *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), *as amended*); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).  Nor do the applicable regulations regarding the Listings require an ALJ to explain how he or she considered particular factors as they do in the context of the new rules applicable to opinion evidence.  *See* 20 C.F.R. § 404.1520c(b)(2) (2021) ("[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.").  While some unpublished Sixth Circuit cases have found that a court may properly look to the ALJ's analysis elsewhere in the decision to assess what the ALJ considered at step three, others discourage speculating as to the ALJ's analysis.  *Compare Bledsoe*, 165 F. App'x at 411 ("The mere failure to discuss every single impairment under the step three analysis is not a procedural error."), *and Forrest*, 591 F. App'x at 366 ("[T]he ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three."), *and Smith-Johnson*, 579 F. App'x at 435 ("It also is proper to consider the ALJ's evaluation . . . at other steps of his decision . . . ."), *with Harvey v. Comm'r of Soc. Sec.*,

---

[3] Claimant cited to *Tyra v. Sec'y of Health & Hum. Servs.*, 896 F.2d 1024, 1028 (6th Cir. 1990), for the proposition that there must be something in the relevant "portion of the [ALJ's] decision that allows a reviewer to determine what facts in the medical record the ALJ relied on for his reasoning."  (DN 17, at PageID # 1504.)  How *Tyra* supports that proposition is not apparent to the undersigned.  The case contains no discussion of the level of detail in which an ALJ must discuss his conclusions and does not involve a challenge to an ALJ's analysis of whether a claimant met a particular Listing.  Accordingly, the undersigned finds that the proper standard is articulated in *Reynolds* and its progeny as set forth above.

No. 16-3266, 2017 WL 4216585, at *6 (6th Cir. Mar. 6, 2017) (noting that while the district court looked elsewhere in the ALJ's opinion to see what medical evidence the ALJ had cited, "[t]he district court should not have speculated what the ALJ may have concluded had he considered the medical evidence under the criteria in Listing 1.02").   Regardless of where a court looks to determine upon what evidence the ALJ relied, if the claimant presents a substantial question as to whether he or she meets the required criteria of a particular listing, the ALJ's failure to do necessary analysis cannot be deemed harmless error.  *Smith-Johnson*, 579 F. App'x at 433 n.5; *Pasiak v. Comm'r of Soc. Sec.*, 800 F. App'x 301, 304 (6th Cir. 2019).  The error is not harmless because "the regulations indicate that if a person is found to meet a Listed Impairment, they are disabled within the meaning of the regulations and are entitled to benefits." *Reynolds*, 424 F. App'x at 416.  With these principles in mind, the undersigned will first assess whether Claimant has raised a substantial question as to the applicability of Listings 1.02 and 1.03 before addressing whether the ALJ's admittedly brief analysis constituted reversible error in this case.

Listing 1.02 provides:

1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

or

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpart P, App. 1, § 1.02 (eff. May 22, 2018 to September 23, 2019).  Listing 1.03 provides, "1.03 Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset."  *Id.* at § 1.03. The Listings separately define "inability to ambulate effectively" as

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.* at § 1.00(B)(2)(b).

With these criteria in mind, the undersigned finds that the Claimant did not identify specific evidence demonstrating he could meet every element of Listings 1.02 and 1.03.  In particular, though Claimant cited to numerous medical records, he cited no evidence that he was unable to ambulate independently "without the use of a hand-held assistive device[ ] that limit[ed] the functioning of *both* upper extremities." *Id.* at § 1.00(B)(2)(b)(1) (emphasis added).  He cited evidence that he used a cane, but a cane does not engage both upper extremities as required by the

applicable Listings.  Without this evidence, Claimant has not raised a substantial question as to whether he met Listings 1.02 and 1.03.  Thus, though the ALJ's analysis was inadvisably brief, the undersigned finds that the ALJ did not commit reversible error in his discussion of Listings 1.02 and 1.03.

### 2.      Combination of Impairments

Claimant also argued that the ALJ failed to properly evaluate "the combination of [his] impairments" and that nothing in the decision "allows a reviewer to understand the ALJ's consideration and reasoning for determining the combination of impairments was considered." (DN 17, at PageID # 1506.)  Discussing multiple impairments individually does not mean the ALJ failed to consider the combined effect of those impairments where the ALJ specifically referred to a "combination of impairments" in finding that the claimant did not meet the Listings.  *Gooch v. Sec'y of Health & Hum. Servs.*, 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988); *Loy v. Sec'y of Health & Hum. Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990).  Here, in his step three finding regarding the Listings, the ALJ specifically noted that Claimant did "not have an impairment or combination of  impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (R. at 20.)  This statement evidences that the ALJ properly considered Claimant's impairments in combination though he may have discussed them individually in his decision.  *See Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 851-52 (6th Cir. 2020).  Though Claimant alleged that the record raised a substantial question as to whether he met the requirements of the Listings in combination, he failed to connect the combination of his impairments to any particular Listing and to cite evidence that his combined impairments met the requirements of that Listing.  Claimant's brief focused on his knee and back pain, but the undersigned already found above that the records he cited did not raise a substantial

11

question as whether he met the requirements of Listings 1.02 and 1.03. Claimant offers no more specific discussion with regard to any other Listing. Though he cited Listings 1.04 and 11.14, he included no specific discussion of the requirements of those Listings and how he met each element of the same. Without such argument and evidence, the undersigned finds Claimant's argument that the ALJ failed to consider whether the combination of his impairments met a Listing to be without merit.

### 3.   RFC

An ALJ's RFC finding is the ALJ's ultimate determination of what a claimant can still do despite his or her physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1), 404.1546(c), (2021). The ALJ bases his or her determination on all relevant evidence in the case record, including statements from medical sources. 20 C.F.R. §§ 404.1529, 404.1545(a)(1)-(4). Thus, in making his or her determination of a claimant's RFC, an ALJ must necessarily evaluate the medical opinions in the record and assess the claimant's subjective allegations. 20 C.F.R. § 404.1527 (2021); 20 C.F.R. § 404.1529(a).

Here, the ALJ found that the Claimant had the residual functional capacity to perform sedentary work. (R. at 21.) The ALJ found that Claimant could not climb ladders, ropes, or scaffolds; could not crawl; could occasionally climb ramps, climb stairs, balance, stoop, kneel, and crouch; could occasionally perform bilateral pushing and pulling with his lower extremities; could occasionally reach overhead with his left upper extremity; could perform frequently bilateral reaching; and could not be exposed to excessive vibration, unprotected heights, or hazardous machinery. (*Id.*) Claimant disputes his ability to perform work at this RFC and raises a number of objections to the ALJ's RFC determination.

a)        **Selective Citations to the Record**

Claimant argued that the ALJ "used selected portions of the medical records to support his

RFC" and that the ALJ omitted or did not resolve contradictory findings in the record. (DN 17, at

PageID # 1508-09.) As a starting point, "[a]lthough required to develop the record fully and fairly,

an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific

evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 F. App'x 727, 733

(6th Cir. 2004) (quoting *Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir. 2000)); *see also Thacker v.*

*Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece

of evidence in the record for his decision to stand."). However, the Court examines the record as

a whole, including whatever evidence "in the record fairly detracts from its weight," without

"resolv[ing] conflicts in evidence or decid[ing] questions of credibility" to determine whether an

ALJ's decision is supported by substantial evidence. *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x

248, 253 (6th Cir. 2016) (quoting in part *Abbott*, 905 F.2d at 923 and citing *Ulman v. Comm'r of*

*Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012)). Thus, where an ALJ has "improperly cherry picked

evidence" instead of "more neutrally weighing the evidence," his or her decision is unlikely to be

supported by substantial evidence. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir.

2009); *see Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) ("[S]ubstantiality

of evidence evaluation does not permit a selective reading of the record.").

The ALJ summarized Claimant's medical condition with citations to records dating

between May 2015 and September 2018. (R. at 22-23.) Regarding Claimant's back, the ALJ

noted that a May 8, 2015, MRI of Claimant's lumbar spine showed bulging discs at L3-4 and L4-

5, moderate right and mild left foraminal stenosis at L3-4, mild bilateral foraminal narrowing at

L4-5, and mild hypertrophy and facet arthropathy at L5-S1. (*Id.* at 22 (citing *id.* at 442).) He

13

summarized that during Claimant's February 9, 2016, independent medical evaluation ("IME"), side bending to the left resulted in contralateral pain and that forward bending was painful. (*Id.* at 22 (citing *id.* at 612).) He cited a December 11, 2017, MRI of Claimant's lumbar spine that showed facet arthropathy at L3-4, abutment of the L3 and L4 nerve roots, a broad disc protrusion at L4-5, and L4 root abutment in the root foramina. (*Id.* at 22 (citing *id.* at 681).) The ALJ found that Claimant's "degenerative changes in the lumbar spine" were accommodated by a restriction to sedentary work with certain other limitations. (*Id.* at 23.)

With regard to Claimant's left shoulder, the ALJ noted that Claimant injured it in a May 4, 2018, motor vehicle accident. (*Id.* at 22 (citing *id.* at 899).) The ALJ summarized that as of June 20, 2018, Claimant had full strength in his left shoulder with resisted external rotation, had mild loss of strength with resisted elevation, and that MRI results showed mild rotator cuff tendinosis, chondral thinning, and irregularity. (*Id.*) The ALJ noted that on August 3, 2018, Claimant still reported pain and tenderness in his shoulder but had full-though-painful range of motion and 5-/5 strength. (*Id.* at 22-23 (citing *id.* at 904).) The ALJ explained that Claimant ultimately had a left shoulder arthroscopy in September 2018 with a Bankart type repair and debridement from the biceps and rotator cuff after which he did physical therapy. (*Id.* at 23 (citing *id.* at 1359).) The ALJ noted that as of a September 19, 2018, post-operative visit, Claimant's physician documented that Claimant was "doing well." (*Id.* at 23 (citing *id.* at 1361).) The ALJ found that the "tears in the left shoulder requiring surgery" were accommodated by limiting Claimant to sedentary work involving only occasional overhead reaching with his left arm and frequent bilateral reaching otherwise. (*Id.* at 23.)

With regard to Claimant's knees, the ALJ summarized that Claimant hurt his right knee in April 2014 after falling from a garbage truck. (*Id.* at 22 (citing *id.* at 326).) As of September 29,

2015, the ALJ observed that corticosteroid injections had failed to alleviate Claimant's pain, and Claimant had bilateral patella crepitus and pain in the medial joint line of his right knee. (*Id.*) The ALJ noted that findings of Claimant's February 9, 2016, IME included reduced range of motion and tenderness in his right knee as well as right calf and thigh musculature atrophy. (*Id.* at 22 (citing *id.* at 612).) The ALJ cited that on August 10, 2016, Claimant reported bilateral knee pain and had both reduced range of motion and tenderness, but Claimant's reflexes were normal. (*Id.* at 22 (citing *id.* at 363).) The ALJ noted antalgic gait and quad atrophy during this visit as well as that imaging demonstrated severe narrowing of the patella femoral joint space. (*Id.*) The ALJ acknowledged that Claimant had a total right knee arthroplasty on January 10, 2017. (*Id.* at 22 (citing 836).) After that, the ALJ recognized, Claimant continued to report left knee pain and demonstrated patellofemoral crepitance in that knee, but also had no effusion, no instability, and normal "motor, sensory, and reflexes" in both lower extremities. (*Id.* at 22 (citing *id.* at 1055).) As of July 26, 2017, the ALJ noted Claimant had "excellent" range of motion in his right knee. (*Id.*) The ALJ cited a September 28, 2017, MRI that demonstrated interval progression of chondromalacia at the patellofemoral compartment and full thickness chondral defect in Claimant's left knee but activity within the normal range in his right knee. (*Id.* at 22 (citing *id.* at 884, 886).) The ALJ summarized that in January 2018, Claimant had reduced range of motion and atrophy in his right calf as well as an antalgic gait. (*Id.* at 22 (citing *id.* at 1110).) By July 2018, the ALJ noted that Claimant still reported buckling in his right knee though surgery had provided him "excellent relief." (*Id.* at 22 (citing *id.* at 1274).) The ALJ cited records stating that Claimant had 120 degrees of range of motion in both knees despite tenderness, moderate patellar crepitation in his right knee, and moderate narrowing of the patella femoral joint space on imaging of his left

knee.  (*Id.*)  The ALJ emphasized that despite Claimant's reports of "significant limitations related to his impairments," by August 2018,

> the record showed [Claimant] had only minimally reduced strength of 4+/5 in the right EHL and left hip flexion but otherwise had 5/5 strength, his gait was normal, his sensory exam was normal, his motor exam was normal, his reflexes were normal, there was no evidence of positive straight leg raise testing, and he showed improvement in the right knee after surgery.

(*Id.* at 23 (citing *id.* at 1290, 1055, 886).)  Thus, the ALJ concluded that Claimant's knee impairments were accommodated by a restriction to a range of sedentary work with no climbing of ladders, ropes, or scaffolds; no crawling; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, and crouching; and occasional pushing and pulling with his lower extremities.  (*Id.* at 23.)

Claimant faulted the ALJ for not addressing his absent right ankle jerk and 1+ Achilles reflex as well as for including a less-than-fulsome assessment of the testing Claimant underwent in September 2018.  (DN 16, at PageID # 1507-08 (citing R. at 1050, 1052, 1385).)  Again, the mere fact that a piece of evidence is not cited in the ALJ's decision does not automatically invalidate his or her analysis.  *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 196 (6th Cir. 2020) ("The ALJ's decision may stand even though he did not expressly reference every piece of evidence in the record.").  As to the absent right ankle jerk and 1+ Achilles reflex, Claimant cited no evidence that these findings demonstrated a lesser level of functioning than permitted by the ALJ's RFC determination other than that his treating physician expressed "concern" about the absent right ankle jerk.  He provided no citation to any medical opinion—by his treating physician or any other provider—or other evidence connecting a limitation in his functioning to his absent right ankle jerk.  The mere existence of a diagnosis is insufficient to demonstrate related functional limitations.  *See Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) (citing *Higgs*

*v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988)) ("But not every diagnosable impairment is necessarily disabling."); *Kennedy v. Astrue*, 247 F. App'x 761, 767 (6th Cir. 2007) ("[A] mere diagnosis of obesity does not establish either the condition's severity or its effect on [claimant]'s functional limitations."). As to the September 2018 testing, the ALJ did summarize the nerve conduction studies that Claimant underwent on September 25, 2018, and noted that they "showed evidence of an axonal sensorimotor polyneuropathy of moderate severity" and "limited evidence of a lumbosacral plexopathy or possibly polyradiculopathy." (R. at 23 (citing *id.* at 1385).) The ALJ then explicitly concluded that "evidence of polyneuropathy" was one of the reasons to limit Claimant to a range of sedentary work. (*Id.* at 23.) Thus, the ALJ's decision evidenced that he did consider the nerve conduction studies even if he did not draw the conclusion from them that Claimant preferred. Claimant has not proven that greater limitations on his functioning were either required or supported by the record.

Claimant also faulted the ALJ for not including a discussion of the evidence from "the months leading up to and subsequent to the knee surgery." (DN 17, at PageID # 1509.) But it is unclear to the undersigned—and Claimant does not specify in his brief—how those records reveal any additional limitations not adequately discussed or covered by the ALJ in his decision. The first medical record regarding Claimant's knee cited by the ALJ is from a September 29, 2015, visit. (R. at 22 (citing *id.* at 326).) Claimant's medical records prior to that date reveal a progression of deteriorating knee symptoms. On August 21, 2013, while at work, Claimant stepped in water meter hole/on a loose water meter lid that was sitting at a "funny angle," twisting and injuring his left knee. (R. at 531, 612.) He reported that he was in "considerable pain." (*Id.* at 531.) His initial diagnosis was a left knee sprain, but ultimately, an MRI showed what looked to Dr. Frank Bonnarens ("Dr. Bonnarens") like a tear in the posterior horn of the medial meniscus

in Claimant's left knee.  (*Id.* at 533, 693, 1163.)   On October 2, 2013, Claimant underwent a chondroplasty on his left knee performed by Dr. Bonnarens.  Dr. Bonnarens noted in the operative report that there was evidence of degenerative changes and diagnosed a chondral flap tear medial involving the femoral condyle and tibial plateau.  (*Id.* at 522, 591.)   Thereafter, Claimant participated in physical therapy.  (*Id.* at 591, 1153-54, 1156.)   By November 19, 2013, Dr. Bonnarens noted that Claimant had full range of motion despite reporting continued pain with squatting, climbing stairs, or rising from a seated position.  (*Id.* at 1156.)   During a December 17, 2013, visit, Claimant reported pain in his right knee after his left knee "wobbled."  (*Id.* at 1157.) at that time, Claimant still reported some pain in his left knee "now and then, but otherwise no real problems."  (*Id.*)   Dr. Bonnarens noted that Claimant had full strength and range of motion and ordered an MRI of Claimant's right knee due to a possible meniscus tear.  (*Id.*)   Claimant did not immediately complete the MRI or pursue other treatment for his right knee due to concerns about whether it would be covered by his worker's compensation carrier.  (*Id.* at 1155.)   Later that same month, Claimant reported that his left knee felt like it wanted to give out on occasion though Dr. Bonnarens documented that "examination of [Claimant's] left knee [wa]s essentially normal."  (*Id.* at 1159.)   When Claimant continued to report a wobbly left knee in January 2014, Dr. Bonnarens ordered an MRI, which found chondromalacia and "edema consistent with the degenerative changes" but "no evidence of acute pathology and no evidence of meniscal pathology or ligamentous injury."  (*Id.* at 574, 1162.)  On February 18, 2014, Dr. Bonnarens noted that Claimant was at maximum medical improvement in his left knee.  (*Id.* at 1162.)   Claimant obtained a second opinion on his left knee, and the other physician, Dr. Craig Roberts ("Dr. Roberts"), diagnosed left knee patellofemoral chondrosis, early left knee medial compartment arthrosis, possible pain

dysfunction syndrome, and quad weakness, but did not recommend operative treatment.  (*Id.* at 592-93.)  Dr. Roberts recommended Claimant return to Dr. Bonnarens for treatment.  (*Id.*)

Then, on April 24, 2014—as the ALJ did note in his decision—Claimant injured both knees and his back in a fall from the back of a garbage truck.  (*Id.* at 22, 739.)  He "strained and twisted both knees and struck his low back on the truck itself as he fell."  (*Id.* at 739.)  During a July 9, 2014, visit with Dr. Thomas M. Loeb ("Dr. Loeb"), Claimant reported knee and back pain though he was still working on restricted duty.  (*Id.*)  He underwent MRIs of both knees that same month.  The MRI of his left knee revealed a soft tissue contusion in prepatellar and pretibial regions, intact cruciates, no traumatic meniscus tear, and retro- and peripatellar inflammation with class 4 penetrating chondromalacia.  (*Id.* at 683, 1101.)  The MRI of his right knee revealed bipartite and mildly inflamed ununited tibial apophyses, class four patellofemoral chondromalacia, chronic appearing and pseudoextruded lateral meniscus with lateral compartment chondromalacia, and no occult fracture.  (*Id.* at 685, 1102.)  In the records of Claimant's July 29, 2014, visit, Dr. Loeb noted "persistent chondromalacia of the patella in both knees" but otherwise full range of motion and no instability; Dr. Loeb stated that Claimant may need surgical intervention in his right knee.  (*Id.* at 736-37.)  He also received a cortisone injection, but reported in September 2014 that the injection did not improve his pain.  (*Id.* at 332, 737.)  On October 17, 2014, Dr. Loeb performed a chondroplasty of Claimant's right patella.  (*Id.* at 357, 732.)  Claimant was off work from October 17, 2014, to at least November 26, 2014.  (*Id.* at 334-36.)  Four months after his surgery, during a February 26, 2015, visit, Claimant still reported recurrent pain in both his knees though Dr. Loeb noted mild patellofemoral crepitance in both knees, 0-120° range of motion with pain, no instability bilaterally, and normal "motor sensory and reflexes" in both lower extremities.  (*Id.* at 337.)  In April 2015, Claimant again reported pain in his right knee that Dr. Loeb noted was "not

help[ed]" by the demands of Claimant's job.  (*Id.* at 340.)  Dr. Loeb referred Claimant for consideration of a patellofemoral arthroplasty.  (*Id.* at 340-42.)

On May 13, 2015, the referral physician, Dr. Madhusudhan Yakkanti ("Dr. Yakkanti"), noted Claimant's complaints of progressively worsening right knee pain and that prior cortisone injections and arthroscopic debridement had not resolved Claimant's complaints.  He noted Claimant had range of motion of 0-115° with significant difficulty and patellofemoral crepitation. (*Id.* at 381.)  He ordered an MRI of Claimant's right knee and a three-phase bone scan.  (*Id.* at 382.)  The MRI revealed no evidence of any meniscus tear or acute ligament injury but did reveal some high-grade articular cartilage loss in the patella with associated subchondral marrow edema, low grade chondral thinning of the superior aspect of the femoral trochlea, somewhat focal areas of high-grade articular cartilage loss involving the central weightbearing surfaces in the medial femoral condyle and medial tibial plateau, and high-grade articular cartilage loss involving the central and posterolateral weightbearing surfaces of the lateral femoral condyle with mild associated subchondral marrow edema.  (*Id.* at 384.)  The three-phase bone scan revealed increased uptake in the patellofemoral joint and medial and lateral compartments of Claimant's right knee consistent with tricompartmental degenerative changes.  (*Id.* at 379.)  During a June 8, 2015, visit, and after reviewing both the MRI and three-phase bone scan results, Dr. Yakkanti told Claimant that Claimant was a candidate for right total knee arthroscopy but that Dr. Yakkanti wanted to first try nonoperative treatment. (*Id.* at 380.)  Claimant was given an additional cortisone injection at that time and a viscosupplementation injection in July 2015.  (*Id.* at 378, 380.)  In early September 2015, Dr. Yakkanti wrote that "[d]espite the chronic pain, the patient continues to work his usual job," and found that "[i]f the patient continues to have difficulty, then the total knee replacement is the ultimate answer with a very [*sic*] likelihood that he may not be able to go back to his usual

job." (*Id.* at 324-25.)  Dr. Yakkanti directed Claimant to consult with Dr. David Caborn ("Dr. Caborn") to assess whether he was a candidate for an isolated patellofemoral replacement in lieu of a total one.  (*Id.* at 324.)  In September 2015, Dr. Caborn found that partial knee replacement was inadvisable because it would only correct part of Claimant's symptoms.  (*Id.* at 326.)

The ALJ cited some though not all of the records of Claimant's visits with Dr. Yakkanti up through the January 10, 2017, right total knee arthroscopy performed by Dr. Yakkanti on the Claimant.  (*Id.* at 22.)  But Claimant's treatment records with Drs. Caborn, Yakkanti, and Loeb between September 29, 2015, and December 14, 2016, are generally consistent with the findings regarding Claimant's right knee in the September 29, 2015, and August 10, 2015, visits cited by the ALJ.  (*Compare id.* at 326-29, 363-65, *with id.* at 353-56, 366-75, 434-37, 486-88.)  Specifically, the visits demonstrate that Claimant failed/did not respond to nonoperative treatments including corticosteroid injections, hyaluronic acid injections, an off-loader brace, and physical therapy (*id.* at 326, 366, 373-74, 487); showed patella crepitus/moderate to severe patella crepitation (*id.* at 328, 364, 366, 368, 371, 374,487); had pain along his medial joint line (*id.* at 328); had moderate tenderness in his medial patella femoral (*id.* at 364, 368, 371, 376, 487); had mild joint effusion/effusion 1+ (*id.* at 328, 364, 368, 371, 374, 487); presented with antalgic gait (*id.* at 364, 368, 371, 373, 487); had quad atrophy (*id.* at 364, 366, 368, 371, 374, 487); had no warmth or erythema (*id.* at 364, 368, 371, 374, 487); demonstrated normal sensation, capillary refill, and reflexes (*id.* at 355, 364, 368, 371, 374, 436, 487); and had decreased range of motion of 5° to less than 120° (*id.* at 364, 366, 368, 371, 374, 487).[4]

---

[4] The undersigned characterizes the records as "generally consistent" because at least one note from Dr. Loeb during this period notes "some full range of motion of both knees" but the record does not specify what full range of motion is.  (*Id.* at 355.)  In view of the other records cited by the ALJ and above, the undersigned cannot find that this one record undermines a determination that the ALJ's decision was based on substantial evidence.

Ultimately, the undersigned finds that the records cited above are consistent with the records cited by the ALJ in his decision and not the result of "selective citation" by the ALJ. The records show a continuing decline to a level consistent with that described in the first records cited by the ALJ. As such, Claimant has not demonstrated how the ALJ's failure to cite/discuss these records was significant, let alone in error, and nothing in the ALJ's decision leads the undersigned to conclude that the records were not at least *considered* as required. In determining whether an ALJ's decision is supported by substantial evidence, a court "may n[either] try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Walters*, 127 F.3d at 528 (citing *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir. 1984)). Thus, the undersigned summarizes the above medical findings not for the purpose of analyzing de novo the appropriateness of the ALJ's determination but rather to illustrate that there were no conflicts to be resolved as the records not cited by the ALJ regarding Claimant's knee-related impairments prior to his total right knee replacement do not "fairly detract[ ] from [the] weight" of the evidence cited by the ALJ. *Conner*, 658 F. App'x at 253 (citing *Ulman*, 693 F.3d at 713). Ultimately, based on consideration of both the records cited and not cited by the ALJ, the undersigned finds Claimant's argument about the ALJ's selective citations to the record to be without merit.

### b)   Closed Period of Disability

Claimant next argued that the ALJ erred in not including a narrative explanation as to why Claimant was not entitled to a closed period of disability related to the "months leading up to and subsequent to the knee surgery." (DN 17, at PageID # 1509.) Disability benefits can be awarded for a closed period. *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972). Therefore, "[a] claimant who meets the twelve-month durational requirement of 42 U.S.C. § 423(d)(1)(A) may be entitled to benefits from the time her disability commences until such time as the disability ceases."

*Hall v. Colvin*, No. 15-181-DLB, 2017 WL 111926, at *2 (E.D. Ky. Jan. 11, 2017); *see also Turk v. Comm'r of Soc. Sec.*, 647 F. App'x 638, 641 (6th Cir. 2016) ("A claimant no longer qualifying as disabled may be entitled to benefits if she previously suffered a disability for a continuing, twelve-month period.").  Here, the ALJ's finding that Claimant was not under a disability from August 25, 2015, through the date of his December 12, 2018, decision implicitly finds that Claimant was not entitled to a closed period of disability at any point between those two dates.  (R. at 25.)  Despite criticizing the ALJ's lack of narrative discussion, Claimant points to no requirement that the ALJ use any specific language or make specific findings relating to a claimed closed period of disability. *See, e.g.*, *Dutkiewicz v. Comm'r of Soc. Sec.*, No. 1:15-cv-163, 2015 WL 8757250, at *5 (W.D. Mich. Dec. 14, 2015) (holding that although the ALJ's decision did not contain a specific finding stating that he considered a closed period of disability, the ALJ had considered the record as a whole, which necessarily showed that he found the plaintiff did not demonstrate a closed period of disability); *Evers v. Astrue*, No. 3:12-CV-118, 2013 WL 1305627, at *12 (E.D. Tenn. Jan. 2, 2013), *report and recommendation adopted*, 2013 WL 1301777, at *5 (E.D. Tenn. Mar. 28, 2013) (finding that the ALJ did not err by only implicitly addressing a closed period of disability); *Sielaff v. Comm'r of Soc. Sec.*, No. 1:10CV1571, 2012 WL 567614, at *1 (N.D. Ohio Feb. 21, 2012) (finding no law exists requiring an ALJ to specifically indicate that a closed period of disability was considered and rejected).  Claimant likewise pointed to no specific records to justify his assertion that he was unable to perform any work during any relevant twelve-month period.  Disability is defined as the "inability to engage in *any* substantial gainful activity." 42 U.S.C. § 423(d)(1)(A).  While the record does contain references to Claimant being off his job during the period leading up to his total knee replacement surgery, Claimant cites no evidence that this equates to an inability to perform *any* work during that same period.  This is particularly

significant because the state agency medical consultants opined on December 12, 2016, and February 2, 2017, that Claimant was capable of sedentary work.  (R. at 79, 95.)  Thus, the undersigned finds that Claimant has demonstrated neither error in the ALJ's failure to explicitly discuss whether Claimant was entitled to a closed period of benefits nor that he was in fact entitled to such benefits.

<strong>c)      SSRs 96-8p</strong>

Claimant next argued that the ALJ's analysis did not comport with SSR 96-8p.  (DN 17, at PageID # 1507-08, 1510.)  SSR 96-8p states that an ALJ's assessment of a claimant's RFC "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p, 61 Fed. Reg. 34474, 34478 (July 2, 1996).  It requires an ALJ's RFC finding to address in a function-by-function evaluation both the exertional and nonexertional capabilities of an individual.  *Id.* at 34476-77.  Exertional limitations relate to an individual's ability to sit, stand, walk, lift, carry, push, and pull.  *Id.* at 34477.  Nonexertional limitations relate to an individual's potential postural, manipulative, visual, communicative, and mental limitations and ability to tolerate various environmental factors.  *Id.*  However, "case law does not require the ALJ to discuss those capacities for which no limitation is alleged."  *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002) (per curiam); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 729 (6th Cir. 2013).

Claimant argued that the ALJ failed to include any specific discussion of his ability to stand or crouch, which was significant given the evidence in the record of Claimant's quad atrophy and buckling.  (DN 17, at PageID # 1508.)  But Claimant merely cited medical records that note his quad atrophy and allegations of buckling.  As explained above, the mere existence of a diagnosis

24

is insufficient to demonstrate related functional limitations.  *See Lee*, 529 F. App'x at 713  (citing *Higgs*, 880 F.2d at 863); *Kennedy*, 247 F. App'x at 767.  Claimant argued that an independent medical examiner who examined him as part of Claimant's worker's compensation case "found he should avoid squatting, kneeling and climbing as well as prolonged gait and repetitive bending." (DN 17, at PageID # 1508.)  But the ALJ found the IME cited by Claimant unavailing of the issue of whether Claimant had any functional limitations because "it did not explain in functional terms what the claimant was able to do."  (R. at 23.)  Claimant argued that the "unambiguous wording of [the] report contradicts th[e ALJ's] conclusion."  (DN 17, at PageID # 1508.)  The undersigned disagrees.  The IME report at Exhibit 15F summarized Claimant's medical history, the results of the examiner's own exam of Claimant, the examiner's impressions of Claimant's injuries including whether they were related to the work injuries Claimant cited, an estimation of whether Claimant was at maximum medical improvement,  the examiner's treatment recommendations, and the examiner's opinion as to whether Claimant had sustained any permanent impairment.  (R. at 612-20.)  The closest the examiner comes to stating Claimant's functional limitations is in the following paragraph:

> Work restriction recommendations for [ ] [Claimant] are that he avoid squatting, kneeling, climbing or prolonged gait.  He should avoid repetitive bending.  He should avoid carrying over 30 lbs occasional [*sic*].  These restrictions are due to the 4/24/14 work injury and preclude [ ] [Claimant] from being able to return to the full scope of his usual work duties successfully performed prior to the 4/24/14 work injury.

(*Id.* at 618.)  Given the examiner's language, it is unclear whether the walking/standing restrictions and only occasional crouching in the ALJ's RFC are consistent or inconsistent with what the examiner envisioned.  Without this information, the ALJ did not err in rejecting the examiner's opinion.

As noted above, the ALJ acknowledged the records noting Claimant's quad atrophy and complaints of buckling, including the independent medical examiner's physical exam findings, and found that these conditions were accommodated by the RFC the ALJ developed.   The ALJ did not determine that Claimant would be able to perform unrestricted standing/walking or crouching.   Instead, consistent with the opinions of the state agency physicians, he limited Claimant to sedentary work, which by definition involves occasional standing or walking, 20 C.F.R. § 404.1567(a), and only occasional crouching. (R. at 21.) The ALJ specifically noted that there was no opinion evidence "in the record—from a treating source or otherwise—with functional limitations greater than those" in the RFC the ALJ developed. (*Id.* at 24.) Claimant has not offered sufficient evidence to dispute this conclusion.  Accordingly, the undersigned finds no violation of SSR 96-8p in the ALJ's decision.

### d)      SSR 96-9p

Claimant also argued that the ALJ's analysis did not comport with 96-9p.  (DN 17, at PageID # 1509-11.)  SSR 96-9p governs the implications of when an ALJ finds that an individual can do less than a full range of sedentary work.  SSR 96-9p, 61 Fed. Reg. 34478 (July 2, 1996).  It explains that while "[a]n RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare[,] . . . finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of 'disabled.' "  *Id.* at 34479.  An RFC limiting an individual to less than a full range of sedentary work will usually result in a finding of "disabled" when the limitations significantly erode the available occupational base for such a claimant, and SSR 96-9p provides guidance for "the impact of various RFC limitations and restrictions on the unskilled sedentary occupational base." *Id.* at 34480-81.  In such circumstances, the SSR requires,

> The RFC assessment must include a narrative that shows the presence and degree of any specific limitations and restrictions, as well as an explanation of how the evidence in [the] file was considered in the assessment. The individual's maximum remaining capacities to perform sustained work on a regular and continuing basis (what he or she can still do 8 hours a day, for 5 days a week, or an equivalent work schedule) must be stated.

> An accurate accounting of an individual's abilities, limitations, and restrictions is necessary to determine the extent of erosion of the occupational base, the types of sedentary occupations an individual might still be able to do, and whether it will be necessary to make use of a vocational resource. The RFC assessment must be sufficiently complete to allow an adjudicator to make an informed judgment regarding these issues.

*Id.* at 34481.  Of particular relevance to Claimant's case, with regards to postural limitations on balancing, SSR 96-9p provides that while restrictions on an individual's ability to balance "would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work," certain types of balancing restrictions might constitute a significant erosion of the unskilled sedentary occupational base.  *Id.* at 34482.  It explains,

> In the S[elected Characteristics of Occupations], ''balancing'' means maintaining body equilibrium to prevent falling when walking, standing, crouching, or running on narrow, slippery, or erratically moving surfaces. If an individual is limited in balancing only on narrow, slippery, or erratically moving surfaces, this would not, by itself, result in a significant erosion of the unskilled sedentary occupational base. However, if an individual is limited in balancing even when standing or walking on level terrain, there may be a significant erosion of the unskilled sedentary occupational base. It is important to state in the RFC assessment what is meant by limited balancing in order to determine the remaining occupational base. Consultation with a vocational resource may be appropriate in some cases.

*Id.*

Claimant argued that his "leg weakness—buckling—impacts [his] ability to balance when walking, standing and crouching, which the ALJ stated [he] could do on an occasional basis," and that the ALJ did not include a sufficient discussion of his ability to balance.  (DN 17, at PageID # 1508.)  The ALJ merely limited Claimant to only occasional balancing but with no specific

discussion of the contours of that limitation.  Despite the ALJ's lack of specificity, the distinction does not seem to have changed the outcome of Claimant's case.  In response to the ALJ's occasional balancing limitation, the vocational examiner ("VE") identified three occupations that Claimant could perform that do not appear to require any balancing at all.  *See* U.S. Dep't of Labor, *Dictionary of Occupational Titles,* § 209.567-014 (rev. 4th ed. 1991) (1991 WL 671794) ("Balancing: Not Present - Activity or condition does not exist"); *id.* at § 249.587-018 (1991 WL 672349) ("Balancing: Not Present - Activity or condition does not exist"); *id.* at § 237.367-014 (1991 WL 672186) ("Balancing: Not Present - Activity or condition does not exist").  Under those circumstances, any "supposedly important need for the ALJ to describe the limitations to balancing is not necessary in the present case."  *Jackson v. Saul*, No. 1:19-CV-00185-HBB, 2020 WL 6277280, at *5 (W.D. Ky. Oct. 26, 2020).  Thus, the undersigned finds Claimant's argument regarding SSR 96-9p to be without merit.

**e)     Pain**

Claimant argued that the ALJ erred in analyzing the extent of his limitations pursuant to 20 C.F.R. § 404.1529.  (DN 17, at PageID # 1509-10.)  That regulation provides that a claimant's statement that he or she is experiencing pain or other symptoms will not, taken alone, establish that he or she is disabled; there must be medical signs and laboratory findings that show the existence of a medical impairment that could reasonably be expected to give rise to the pain and/or other symptoms alleged.  20 C.F.R. § 404.1529(a).  If the ALJ finds that there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ must then assess the intensity and persistence of a claimant's symptoms to determine how those symptoms limit the claimant's capacity for work.  20 C.F.R. § 404.1529(c)(1).  In doing so, the ALJ should consider a number of factors including a claimant's daily activities, effectiveness

28

of any medication taken to relieve symptoms, and any side effects of that medication.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929) ("Relevant factors for the ALJ to consider in his evaluation of symptoms include the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms, such as lying on one's back; and any other factors bearing on the limitations of the claimant to perform basic functions.").  However, the regulations only require an ALJ to *consider* the pertinent factors; they do not require the ALJ to discuss all the factors in his or her opinion. *See Dutkiewicz v. Comm'r of Soc. Sec.,* 663 F. App'x 430, 433 (6th Cir. 2016) ("The ALJ was not required to explicitly discuss [claimant]'s work history when assessing his credibility . . . .").  Thus, the undersigned finds Claimant's argument that the ALJ "failed to apply the full test" or "discuss the[ ] factors" to be nondispositive.  (DN 17, at PageID # 1509.)  To the contrary, the ALJ summarized Claimant's own testimony regarding his subjective limitations, injuries, and pain before concluding, consistent with applicable regulation, that Claimant's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record." (R. at 22.)  Claimant pointed to no specific evidence with regard to the 20 C.F.R. § 404.1529 factors that the ALJ failed to consider.  Accordingly, the undersigned finds Claimant's argument to be without merit.

### f)      State Agency Physicians

Claimant argued that it was error for the ALJ to give great weight to the opinions of the state agency physicians because they did not consider the entire record and based their opinions only on evidence from prior to their December 12, 2016, and February 22, 2017, opinions.  (DN

17, at PageID # 1511; R. at 65-80, 82-97.)  In making a determination of a claimant's RFC, the ALJ is required to consider the record as a whole, including the claimant's testimony and opinions from the claimant's medical sources.  *See* 20 C.F.R. § 404.1545(a).  The source of a medical opinion dictates the process by which the ALJ gives it weight.[5]  *Gayheart*, 710 F.3d at 376.  Generally, the ALJ is required to give more weight to a source who has examined the claimant than one who has not and more weight to a source who regularly treats that claimant than one who does not.  *Id.* at 375.  Pursuant to the applicable regulations, ALJs " 'must consider' the medical findings of State Agency medical and psychological consultants because they 'are highly qualified' physicians and psychologists as well as 'experts in Social Security disability evaluation' " *Pickerell v. Saul*, No. 3:18-cv-281-HBB, 2019 WL 4280589, at *3 (W.D. Ky. Sept. 10, 2019) (citing 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2)).  There will always be a gap between the time the agency experts review the record and give their opinion and the time the hearing decision is issued.  *See Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009).  "Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand."  *Id.*; *see also McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009).  Here, the ALJ provided an extensive discussion of the medical evidence that post-dated the state agency physicians' review.  That evidence does not so clearly invalidate the state agency physicians' opinions so as to render reliance on the same untenable.  Indeed, the evidence relied on by the ALJ shows an improvement in Claimant's functioning such that Claimant should have still be able to do what the state agency physicians opined in their reports.  Claimant pointed to no sufficient opinion evidence in the record that

---

[5] The new regulations for evaluating opinion evidence do not apply to Claimant's claim because his application was filed before March 27, 2017.  *Compare* 20 C.F.R. § 404.1527(c)(2) ("For claims filed before March 27, 2017, the rules in this section apply."), *with* 20 C.F.R. § 404.1520c ("For claims filed on or after March 27, 2017, the rules in this section apply.").

contradicted the state agency physicians and the ALJ's reliance on their opinions.  Thus, the

undersigned finds that Claimant has failed to demonstrate that the ALJ's reliance on the state

agency physicians' opinion(s) was inappropriate under the circumstances.

### g)      Substantial Evidence Generally

Based on the conclusions above, the undersigned finds that the ALJ's RFC determination

was supported by substantial evidence.  The ALJ formed his RFC based on an evaluation of

Claimant's subjective complaints and the medical evidence of record discussed above.  The ALJ

also relied on the opinions of the state agency physicians and noted that no opinions in the record

posited "functional limitations greater than those in the established [RFC]."  (R. at 24.)  His

analysis more than surpasses the threshold for substantial evidence, which is "not high." *Biestek*

*v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229

(1938)) ("Under the substantial-evidence standard, a court looks to an existing administrative

record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual

determinations.  And whatever the meaning of 'substantial' in other contexts, the threshold for

such evidentiary sufficiency is not high.").  Claimant did nothing more than point to other evidence

in the record he claimed supported an opposite conclusion to that reached by the ALJ.  However,

this Court's role is not to second-guess the ALJ's conclusions. *Gayheart*, 710 F.3d at 374; *Smith*,

893 F.2d at 108; *Ulman,* 693 F.3d at 714.

### 4.      Findings Nos. 9-11

Claimant also argued that the ALJ's Findings Nos. 9, 10, and 11 were incorrect.  (DN 17,

at PageID # 1512.)  His entire argument on these points appears to be that because the ALJ's RFC

determination was not supported by substantial evidence these subsequent determinations were

also in error for the same reasons refuted above.  (*Id.*)  The undersigned has determined above that

the ALJ's RFC determination was supported by substantial evidence.  Accordingly, Claimant's arguments regarding Finding Nos. 9, 10, and 11 are without merit.

## III.    RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **AFFIRMED**.

Colin H Lindsay, Magistrate Judge
United States District Court

cc:    Counsel of Record

July 19, 2022

<u>Notice</u>

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations.  A copy shall forthwith be electronically transmitted or mailed to all Parties.  28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal.  *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).